UNITED STATES DISTRICT COURT
STATE OF LOUISIANA
EASTERN DISTRICT

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

JIMMY WOODROW MAGEE

VERSUS

WARDEN KENT, et al.

CIVIL ACTION

NO. 19-9487

SECTION "M" (2)

RESPECTFULLY SUBMITTED:
JIMMY W. MAGEE # 506356
DIXON CORRECTIONAL INSTITUTE
UNIT 2 DORM 1
P.O. BOX 788
JACKSON, LA 70748-0788

TENDERED FOR FILING

MAY 15 2019

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

# INDEX

STATUTES, LOUISIANA CODE OF CRIMINAL PROCEDURE:     PAGE

R.S. 14: 42.1                                           2
R.S. 14: 35                                            2
R.S. 14: 46                                            2
R.S. 14: 41.1                                          2
Article 218.1                                    13, 14, 15, 16, 28, 29
Article 511                                          16
Article 729.3                                    20, 21, 29
Article 729.5                                        17
Article 718                                        18, 21
Article 719                                          21
Article 731                                          25

FEDERAL STATUTE:
  28 USC § 2254                                        1

LOUISIANA CONSTITUTION OF 1974:
Article 1 § 2                                       21, 25
Article 1 § 13                                       15
Article 1 § 16                                    12, 16, 21

UNITED STATES CONSTITUTION:
AMENDMENT 5                                      12, 16, 21, 25
AMENDMENT 6                                      12, 16, 21, 25
AMENDMENT 14                                     12, 16, 21, 25

CONCLUSION                                          31

TABLE OF AUTHORITY:

| | PAGE |
|---|---|
| HAINES V. KERNER, 404 U.S. 519 (1971) | 1 |
| CARRAWAY V BETO, 421 F.2d 636 (5th Cir. 1970) | 8 |
| KING V BETO, 429 F.2d 221 (5th Cir. 1970) | 8 |
| U.S. V CRONIC, 466 U.S. 684 (1984) | 9 |
| MURRAY V CARRIER, 477 U.S. 478 (1986) | 9 |
| GRIFFIN V ILLINOIS, 351 U.S. 12 (1956) | 9 |
| In re WINSHIP, 397 U.S. 358 (1970) | 9 |
| STRICKLAND V WASHINGTON, 466 U.S. 688 (1984) | 10,25 |
| MIRANDA V ARIZONA, 384 U.S. 436 (1966) | 15 |
| BRADY V MARYLAND, 373 U.S. 83 (1963) | 16,20,29 |
| U.S. V BLAIS, 98 F.3d 647 (1996) | 17 |
| STRICKLER V GREEN, 527 U.S. 263 (1999) | 17 |
| U.S. V GIL, 297 F.3d 93 (2002) | 17 |
| STATE V WILLIAMS, 866 So.2d 1003 (5th Cir. 2004) | 18 |
| STATE V VALBERTO, 665 So.2d 614 (5th Cir. 1995) | 18 |
| STATE V MARSHALL, 660 So.2d 819 (1995) | 18 |
| STATE V ELLIS, 657 So.2d 341 (5th Cir. 1995) | 18 |
| STATE V DUROSSEAU, 637 So.2d 1065 (1994) | 19 |
| HARVEY V HORAN, 285 F.3d 298 (2002) | 20 |
| McCOY V COURT OF APPEALS, 486 U.S. 429 (1988) | 20 |
| U.S. V WADE, 388 U.S. 218 (1967) | 20 |
| STATE V FRANCIS, 809 So.2d 1132 (2002) | 20 |
| In re Oliver, 333 U.S. 257 (1948) | 22 |
| McMANN V RICHARDSON, 397 U.S. 335 (1970) | 23 |
| CULYER V SULLIVAN, 466 U.S. 335 (1980) | 23 |
| HAMILTON V ALABAMA, 368 U.S. 52 (1961) | 25 |

PETITION:                                    PAGE

STATEMENT OF CASE                            2,3

ISSUES FOR REVIEW                            3

ARGUMENT                                     3-30

PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS
UNITED STATES DISTRICT COURT
EASTERN - DISTRICT
STATE OF LOUISIANA

MAY IT PLEASE THIS HONORABLE FEDERAL COURT:

NOW COMES JIMMY WOODROW MAGEE, pro-se, in forma pauperis here-after referred to as Petitioner. Petitioner respectfully submits this petition with facts, issues, Exhibits from the transcripts, medical records, police reports, statements from witnesses and the alleged victim Janet Branch of how the alleged crime was brought through fabrication of allegations; violations of Federal Constitutional Amendments, Louisiana Constitutional Amendments, and LA C.Cr.P. Articles, and violations of Brady issues where someway Petitioner was found guilty at the end of trial. Petitioner has claimed his innocence from the beginning of this case until this day.

Petitioner asserts that being a pro-se complaintent through Haines V Kerner, 404 US 519 (1971), the allegations in this petition shall be held to less stringent standards than formal pleadings drafted by a lawyer. Petitioner shall respectfully demonstrate the cause for default with the constitutional violations that took place throughout these proceedings where Counsel Knight's actions were deficient prejudicing this case where the outcome was unreliable. This writ ensues inter-alia:

This petition is filed under 28 USC § 2254 for Writ of Habeas Corpus by a person who is in State custody.

## STATEMENT OF CASE

August 5, 2012, after an interview with Detective Stubbs Petitioner was arrested for one (1) count of R.S. 14:42.1, one (1) count of R.S. 14:35, and one (1) count of R.S. 14:46.

Petitioner was transferred to Richwood Correctional Center for a possession of marijuana charge to go through a drug treatment program. July 31, 2013, Petitioner completed the program. Petitioner had his mother's residence submitted on the release papers.

Petitioner had been awaiting a bus at the bus station. The officers from the Richwood Correctional Center returned explaining to Petitioner that he needed to sign some papers that were not signed. Petitioner went back to the Richwood Correctional Center. When they arrived there Petitioner was informed that he had a detainer on him from Washington Parish. Petitioner was returned to Washington Parish for the original charges.

November 2, 2012, the examination and DNA analysis was sent to the the Washington Parish Sheriff's Office and the District Attorney of the 22nd Judicial District Court. The defense had an open file policy of the District Attorney, yet this examination was not given to Counsel Knight until Sunday, April 3, 2014. The time limit the prosecution gave this exculpatory evidence to the defense violated the due process clause of Brady prejudicing this case from the beginning. This disclosure of exculpatory evidence of one (1) year and five (5) months after its release to the Washington Parish Sheriff's Office and the District Attorney violates the letter and spirit of LA C.Cr.P. Article 729.3. Continuing duty to disclose. The state failed to promptly notify Counsel Knight of exculpatory evidence, so a proper defense could be made through defense's expert witness. This evidence was disclosed to Counsel Knight less than ten (10) days before trial.

April 14-17, 2014, Petitioner went through a jury trial for one (1) count of R.S. 14:42.1 and one (1) count of R.S. 14:44.1, and found guilty beyond a reasonable doubt. April 30, 2014, Petitioner was sentenced by Honorable Judge Garner to serve twenty-five (25) on the forcible rape charge and

twenty-five (25) years on the 2nd degree kidnapping charge, both without benefit of probation, parole, or suspension of sentence.

Petitioner shall show through many constitutional violations, violations of statutes, and his innocence of these charges that the cause for default shall be excused as not being timely filed.

## ISSUES FOR REVIEW

(I.) WHY WERE THREE (3) PROMINENT EYEWITNESSES OF THIS ALLEGED CRIME NEVER INVESTIGATED BY COUNSEL KNIGHT NOR DID THE WASHING PARISH SHERIFF'S NEVER ESTABLISH A CRIME SCENE?

(II.) WHY WERE THE MIRANDA RIGHTS VIOLATED?

(III.) WHY WERE BRADY ISSUES OVERLOOKED BY DISTRICT ATTORNEY ADAIR?

(IV.) WHY WAS COMPULSORY PROCESS FOR PETITIONER COMPLETELY IGNORED?

(V.) WHY WAS INEFFECTIVE ASSISTANCE OF COUNSEL KNIGHT THROUGHOUT THE WHOLE PROCEEDINGS ESTABLISHED BY HIM NOT TAKING PART BY CREATING A DEFENSE, NO TYPE OF INVESTIGATION, AND NOT ADVOCATING THE DEFENSE OR THE PROSECUTION'S CASE PROPERLY?

## ARGUMENT

(I.) COUNSEL KNIGHT'S INEFFECTIVE ASSISTANCE OF COUNSEL BY NOT PROPERLY PREPARING A DEFENSE, INVESTIGATING ANY PORTION OF THE DEFENSE OR PROSECUTION'S CASE, NOR BEING A VALUABLE ADVOCATE FOR THE DEFENSE

Petitioner asserts that an uncommon occurance took place August 5, 2012. This case began out of the ordinary with unaccustomed things not taking place the way they usually did. After three (3) days of being beaten and raped, the alleged victim, Janet Branch, went to Ramona Magee's home to call Leroy Slick Seals to come get her. She wanted him to bring her to her residence.

There were six (6) hours or more before Janet Branch called 911 reporting this assertion of charges towards Petitioner. While she was at

Ramona Magee's making the phone call, Ms. Magee would have seen deep bruises on her face before the phone call was made to Mr. Seals. At this time Janet Branch did not look as she looked at approximately 3:45 p.m.. The tremendous bruising that was upon her more than six (6) hours after the phone call was "not" there at the early morning time. During three (3) days of being beaten, Janet Branch would have shown this from the beginning of seeing Ramona Magee.

Leroy Slick Seals had been Chief of Police. At this time he was a police officer. Surely, he would have known if a person had been beaten for three (3) days, yet at this time nothing was done towards Petitioner being arrested. This took place twelve (12) hours later. These are two (2) prominent people that lived in the community their whole lives a-biding by the law all of time.

Ramona Magee was questioned during the trial by Counsel Knight. [Transcripts, page 63 - 67, lines 1 - 1�] [Page 64, line 32 - 67, lines 1 - 1�] A. I asked two or three times if she wanted to call the law. She didn't want to call the law. She wanted to call Mr. Slick Seals to come get her. She called Mr. Slick to come after her. Q. Okay. And during that 20, 25 minutes, did you have occasion to view her, to see her? A. Yes. Q. Did you see any injuries or wounds to her body? A. No. Q. Let me show you these photographs, Ms. Magee. Next photo please. Did you see anything like that on Janet Branch on August 5, 2012, about mid morning (indicating)? A. No. Q. Next photograph, please. Did you see anything like that (indication)? A. No, sir. Q. Same question, August 5, 2012, about mid morning? A. No, sir. Q. Next. A. No, sir. Q. Is that the same lady? A. That's the same lady. Q. You didn't notice any of those injuries on her August 5, 2012, about mid morning? A. No, sir. Q. Next photo, please. Is that the same lady? A. Same lady. Q. Did you notice any injuries that

4

might be depicted in that picture on August 5, 2012? A. No, sir. Q. Next picture. Do you know if she had shoes on? A. I don't know. Q. Did you notice anything that might have looked like that on August 5, 2012, at mid morning? A. No, sir. Q. Next picture. Did you notice anything that might have looked like that on August 5, 2012? A. No, sir. Q. Next picture, please. Did you notice anything that might have looked like that on August 5, 2012, mid morning? A. No, sir.

The only thing the two (2) eyewitnesses saw as an infliction on Janet Branch was where she was or had been crying, with "no" injuries on her face. The medication Janet Branch takes makes bruising appear upon her without being hit. [Admission Home Medication and Allergy List, LSU Health Care Services Division]

Petitioner's innocence is substantive. Why did Counsel Knight never investigate any portion of this case at all? [Counsel Knight's notes of Jimmy Magee] Leroy Slick Seals was never interviewed by Counsel Knight nor by the Lead Investigator Detective Stubbs at any time during the beginning of this case. Why was Janet Branch's credibility never brought up? There was approximately six (6) hours of her not reporting this incident to a 911 call, after supposedly being beaten and raped for three days. Through arrest reports [submitted] Petitioner was arrested as soon as anything happened to her where the police were called immediately.

Darryl Cooper, Electrician, WST Electric, was the first eyewitness that saw Janet Branch on the second day of this incident. Mr. Cooper came to Petitioner's residence to turn the electricity on. He saw Janet Branch coming out of Petitioner's trailer. [Transcribed Statement of Darryl Cooper Interviewed by Detective Stubbs, August 6, 2012, Incident # 2012080160] Page 1, Cooper: ...it was approximately five minutes later the lady walked out of the camper with a bag like she was trying to leave and she went toward the driveway to walk out and he said told me he said you better go I got to go take care of this. And he went

to the in front of the woman and stopped her and she pushed him trying to get on away... [Page 2] So I left went out to the end of the road. To the Woodrow Magee Road across the road to Tammy and Wayne Nobles house and I was talking to Wayne about it and he gave give me the house phone and I called the Sheriff's Department and reported what I seen. STUBBS: DID you now just so I make sure Did you say he you saw him did he ever physically touch her that you saw? COOPER: I did not see him hit her or hold her. I seen her push him trying to get him out of the way look like where she could leave but I actually never seen him hit her. STUBBS: Did she ever say anything to you at all? COOPER: SHE never said anything.

[Darry Cooper, Transcript, page 230- 258, in part][Page 234, lines16-19], A: commotion, but I heard a woman's voice say, go ahead and get-- "Let's go ahead and get this over with." And that's the only time I heard a woman's voice. [Page 246, lines 1-4], Okay. Now, during that time, did you see any force or violence used by the defendant, Woody Magee, on the woman that you saw out there? A. No, sir, I didn't. [lines 5-13], Q. During that period of time, did you see any force or violence used by the woman on Woody Magee out there? A. The only thing I seen her do wash push him. It looked like she was trying to get him out the way where she could keep going the way she was going. [Page 251, lines 20-23], Q. And she comes out the door, not running, not screaming, not hollering, and she walks down the side of the trailer? A. Right. [Page 252, lines 4-6], Q. And she wasn't screaming and hollering or yelling or running? A. No. [line 32 - Page 253, lines 1-4], any woman screaming, "Please help me." A. No, Q. "Call 911." A. No. Q. "Please help me." A. No, sir. [Page 256, lines 11-13; lines 23-29], Q. Did you ever see, while you were out there, Woody Magee hit her? A. No, sir. Q. Did you ever see Woody -- okay. Well, then you didn't see Woody Magee throw her into the trailer, right? A. No, sir. [D.A. Adair, Page 258, lines 18-22] A. I don't remember hearing anything when I drove off. Q. I mean, were you listening specifically? A. I seemed like I was trying to listen, but I didn't hear anything from that point.

[Transcribed Statement of Janet Branch Interviewed by Detective Stubbs on August 8, 2012, Incident # 2012080160] Page 16, Branch: It just go ahead and do it and get it over with you a'int gone do nothing else. Something similar to all of that and then when I got outside I went to screaming when he throwed me to the ground when he started dragging me I went to screaming for help. Help me please help me get you know leave me alone Woody you know help me please help me and uh I hollered to call 911 please help me. And when we got to the door I told Woody I said well just get it over with Woody just get it over with. And he was dragging me in the trailer and beating my head on the floor.

Darryl Cooper did not substantiate any conduct just through his statement to Detective Stubbs constituting anything Janet Branch stated in her statement. Janet Branch in her statement claimed she screamed, hollered, and stated Petitioner drug her in the trailer beating her head on the floor. Darryl Cooper stated he did not see Petitioner hit or hold her at any time. She never said "ANYTHING." [Transcript, Page 246, lines 1-4], Q. Okay. Now during that time, did you see any force or violence used by the defendant, Woody Magee, on the woman you saw out there? A. No, sir, I didn't. Everything else in the transcript goes directly against anything that Janet Branch said took place. This incident was brought up by fabrication because Darryl Cooper personally knew either person. He would have said that Janet Branches face was bruised during his statement and while testifying at trial, yet he did not. Nothing was confirmed during either of these times.

How could three (3) prominent eyewitnesses "not see" anything that Janet Branch stated which supposedly took place with her right after it was implied that it happened? The facts of the situation is that it never happened. The bruising came to be during the six (6) hour delay before Janet Branch made the 911 phone call. Petitioner would have been arrested as soon as Leroy Slick Seals saw her, not twelve (12) hours later. [Transcript, Page 19, lines 31-32; Page 20, lines 1-5,

7

lines 25-31, D.A. Adair_], Q Did you tell him that you had been raped? - A. No, sir. Q. Why? Why not? A. Mr. Slick is a fragile man. I was too embarrassed to tell him that. He was up -- he appeared to be upset from what had happened, you know. Q. Why didn't you ask him to bring you to the hospital or to the police station? A. I just wanted to go home. All I could think about was going home. I did feel safe at home, and I knew I knew that I could get another phone and call. And I was hurting so bad and confused. I just wanted to go home.

Leroy Slick Seals was not a fragile person at this time. At this time he was an officer of the police force. The investigation of these three (3) eyewitnesses by Counsel Knight would have helped create a prominent defense with going over at least the transcribed statements of Darryl Cooper and Janet Branch. There is a great propobility that these inconsistencies of what was said by these eyewitnesses would have changed the whole outcome of this case.

This duty to investigate witnesses on both sides of this case was pertinent because reasonable effective assistance of counsel must be based on professional decisions and informed legal choices that can be made only after investigation of options and witnesses have been made. [Progress of the lawyer's Work / Investigation and preparation Standard 4-4.1 Duty to Investigate (a)] In plain terms the right to present a defense after investigation is just as important to produce the versions of facts where the truth promply lies, which was never done. The amount of pretrial investigation that is reasonable defies precise measurement of what actions are taken. Investigating these three (3) prominent witnesses would have cleared Petitioner of these charges. While Petitioner claimed his innocence throughout these proceedings with proper investigation taking place, these witnesses would have cleared him for these allegations never took place. [Caraway v Beto, 421 F.2d 636 (5th Cir. 1970); King v Beto, 429 F.2d 221 (5th Cir. 1970)] Through this one (1) plausible line of defense Counsel Knight must conduct a reasonably substantial investigation into that line of defense since there is no strategic choice that renders such an investigation unneces-

sary, but he did not. No pretrial investigation ensued. Counsel Knight's most basic duties were not met. He had to act as Petitioner's effective advocate during each stage of the defense that was never done. [U.S. v Cronic, 466 U.S. 684 (1984); Murray v Carrier, 477 US. 478 (1986)]

Through being informed of the tactical considerations violates Counsel Knight's duty to conduct a factual and legal investigation where competent assistance of counsel did not take place because he was not a diligent conscientious advocate. The evidence against Petitioner was not overwhelming. Cases are not won in the courtroom. They are won by long laborous hours of investigation and preparation of facts, elements of innocence, and having the defense correct. There can be no equal justice where the kind of trial a man receives depends on the amount of money he has. Are the officials in this section of the state vindictive against Petitioner? Why? [Griffin v Illinois, 351 U.S. 12 (1956)] Through numerous short comings, omissions, and outright disloyalty Counsel Knight failed to act as a reasonable advocate for Petitioner violating substantial and procedural rights throwing him to the wolves.

The fundamental value determination of our society is that it is far worse to convict an innocent man than to let a guilty man go free. The quintessential miscarriage of justice is the execution of an innocent person. [In re Winship, 397 U.S. 358 (1970)] There was exculpatory scientific evidence that the prosecution withheld until days before trial, not investigating a prominent eyewitness that is no longer with us, nor two (2) eyewitnesses that stated against "all" Janet Branch claimed that took place with her for three (3) days. [Transcripts]

Ms. Ramona Magee was the second eyewitness to observe Janet Branch after three (3) days of supposedly being beaten and raped by Petitioner, yet what she stated in the transcripts was completely different from what was

9

stated during other portions of the trial. Leroy Slick Seals was the third person to see Janet Branch after this fabricated scenario at a very close distance. Lead Investigator Detective Stubbs "never intervied" Leroy Slick Seals. [Transcripts, Page 46, lines 4-6], Q. Did you ever take a statement from Slick Seal in this case? A. No, Sir.

At this time Leroy Slick Seals was a police officer. He was the last eyewitness to see Janet Branch before six (6) hours later she made a 911 FALSE phone call that did not take place. Darryl Cooper was the first eyewitness to see Janet Branch. Nothing was collaberated through his statement or testimony in court with the false statements Janet Branch gave from her statement or testimony, supra. Why were these three (3) prominent people "not believed by anyone?"

Through Petitioner stating his innocence of the whole incident to Counsel Knight from the beginning of this case, why did he not bring about proper investigation through being informed the whole time by Petitioner? Serious charges were placed against Petitioner. [Strickland v Washington, 466 U.S. 688 (1984)] The Washington Parish Sheriff's Office never established a crime scene. [Transcripts, Page 31, lines 21 - Page 32, lines 1-3], Q. Do you know where she got it? A. She said she had recovered it. Q. No. Do you know where she got it? Do you know -- A. Was I there when she got it. No. Q. Were you there when she got it? A. No. Q. Was there anyone from the sheriff's office there, to your knowledge, when she got it? A. Not to my knowledge. Q. So you don't know, from your own personal knowledge, where this shirt came from? A. No. I was not around when it was recovered. Q. You would only have to take the word of Janet Branch where the shirt came from? A. Correct. [Page 32, lines 14 - 20].

Q. Turned in by the complaining witness in this case. Do you typically take evidence from complaining witnesses in the case? A. If they recover something we don't, yes. We will take it, yes, sir. Q. Even though you don't know where it came from? A. I don't know where exactly it came from.

Janet Branch is not a police officer. The main ingredient of this case took place during the six (6) hour period between Janet Branch leaving Ramona Magee's residence, and the phone call that was made at approximately 3:45 p.m.. Intentional disregard of the truth was seriously lacking even when the phone call was made. This Honorable Federal Court must assess the probative force of this newly discovered evidence in connection with the fabrication and lack of probable evidence of guilt adduced at trial. This Honorable Federal Court should properly balance the dictates of justice with the need to ensure that this actual innocence exception remains a safety valve for this extraordinary case. The medication Janet Branch takes makes bruising come upon her in any way. [LSU Health Care Services Division] Truthfulness of factual allegations from three (3) prominate eyewitnesses, one (1), the second day, Darryl Cooper, and two (2), Ramona Magee and Leroy Slick Seals the third day with all three (3) seeing Janet Branch at a close distance to see "no injuries" were on her face, yet Counsel Knight did not pursue this reasonable investigation.

Counsel Knight is subject to standards of conduct stated in statutes, rules, codes, cannons, other standards of professional conduct, and constitutional amendments, yet he varied from his duty to properly represent Petitioner. In protecting Petitioner's rights he should have resisted some of the ways of Honorable Judge Garner's appearing unyielding or uncooperative ways at times, but he did not. In doing

So he is not contradicting his duty to the administration of justice, but is fulfilling a necessary and important function within the advasary system. The advarsary system requires defense counsel's presence and zealous professional advocacy just as it requires the presence and zealous advocacy of the prosecution with constant neutrality of the judge. Toward the client, the lawyer is a counselor and an advocate. Toward the prosecutor, the lawyer is a professional adversary. Toward the court, the lawyer is both advocate for the client and officer of the court. This demands that the lawyer be inclined towards vigerous advocacy, preparation, and investigation. Once a case has been taken, a lawyer is obliged "not" to omit any essential lawful and ethical steps in the defense without regard to compensation or the nature of appointment. Counsel Knight left "all" of the actions towards creating any defense in this case completely out. This has been well shown throughout this argument.

Petitioner asserts that entirely showing a perponderance of lack of investigation by the Washington Parish Sheriff's Office and Counsel Knight, a defense was never undertook with disregard towards Petitioner's innocence, the medication that Janet Branch took was never inspected towards making bruises upon her easily from any type of way, and totally ignoring false statements that Janet Branch gave from the beginning of this case.

Whereas, Petitioner urges that through violations of statutes, Article 1 & 16 of the Louisiana Constitution, and Amendments 5, 6, and 14 of the United States Constitution, this Honorable Federal Court should dismiss this conviction and sentence.

(II.) VIOLATIONS OF MIRANDA RIGHTS AND LA C.Cr.P. ARTICLE 218.1. Advice of reasons for arrest or detention and of rights

Detective Stubbs was the lead investigator in this case. August 5, 2012, Detective Stubbs interviewed Petitioner. Petitioner started talking to Detective Stubbs after being given his Miranda Rights and consent to questioning. [Paperwork submitted] The recorder was turned on. At this time Petitioner thought he was being questioned on a charge of possession of marijuana because that is what the police officers told him. This was from Bogalusa, LA. These charges were already satisfied.

Detective Stubbs and Petitioner went back to discussing this situation. [Transcribed Statement of Jimmy "Woody" Magee Interviewed by: Detective Anthony Stubbs, Incident # 2012080160] Magee: WHAT ARE YOU LEADING UP TO? Stubbs: WELL I GOT SOME QUESTIONS WE NEED WE NEED TO TALK ABOUT. Magee: IS SHE TRYING TO PUT RAPE CHARGES ON ME OR SOMETHING? Stubbs: WELL WE GONE WE GONE GET THERE. LET'S TAKE IT A STEP AT A TIME. Magee: I PLEAD THE FIFTH AND I'LL WAIT TILL I GET A LAWYER. Stubbs: ALL RIGHT. I APPRECIATE IT. THE TIME IS NOW 10:51. [TRANSCRIPTS, Page 33-42, Page 4-30], Lead Investigator Stubbs states his duties. [Transcript, Page 20, lines 12-18], Q. But the reason you picked him up was to detain him on allegations being made by Janet Branch of forcible rape, simple battery and false imprisonment; is that correct? A. Correct. I had asked that they go and see if he would come and talk to me about it, about the incident. [Page 21, lines 14-22], Q. Isn't it a fact, Detective Stubbs, that you did not inform Jimmy Magee prior to recording his statement that he was being detained on suspicion of forcible rape, simple battery, and false-

imprisonment because you wanted to get a statement from him. regarding those issues? A. Correct. That's what I wanted to talk to him about, those issues that Ms. Branch had stated had happened. [Page 13, lines 12-16], Detective Stubbs; I had contacted the patrol officers and asked if them if they could get in touch with Mr. Magee, advise him that I needed to speak with him concerning the report that we had got from Ms. Janet Branch. [Page 15, lines 4 - 8], The charge on this on this one is forcible rape. -- Q. What else? A. -- with the underlying offenses of simple battery and false imprisonment. Q. So Mr. Magee as far as you know had no idea before 10:41 o'clock p.m. and before he gave his statement that he was going to be arrested for forcible rape, simple battery, and false imprisonment, did he? [Page 16, lines 12-14] A. I have no idea if he knew that. I don't -- I didn't tell him. So I have no idea if he knew that. [Page 16, lines 29 - 32], Q. Judge Burris signed it. At what time did Judge Burris sign this arrest warrent? A. It's not indicated on this. [17, lines 1 - Page 18, lines 1 - 32], [Page 42, lines 7 - 12], Q. Dectective Stubbs, you state that -- you tell Jimmy Magee during his statement, "right now the charge you got with the Sheriff's Office is possession of marijuana, okay." Do you remember that? A. Uh-Huh (affirmative response).

How are there discrepancies with the Lead Investigator, Detective Stubbs? How and when did the charges upgrade? [Transcripts, Page 5 - 24], Detective Stubbs partial duties.

The LA C.Cr.P. Article 218.1. Advice of reasons for arrest or detention and of rights When a person has been arrested or detained in connection of any offense, "he shall be fully advised" for the reason

for his arrest or detention, his right to remain silent, his right a-
gainst self-incrimination, his right to assistance of counsel, and,
if indigent, his right to court appointed counsel.

Petitioner was not fully advised of the proper charges timely by
Lead Investigator Detective Stubbs while be interviewed from
the start of questioning. [Transcripts, Page 5, lines 1 - Page 8,
lines 1-32] Why did Detective Stubbs "not fully advise" Peti-
tioner of the real reason for interrogation when he explained it
completely to the patrol officers? The patrol officers did not fully ex-
plain to Petitioner the exact reason for interrogation when they knew.
[Page 13, lines 12-16, supra]

This violates due process of LA C.Cr.P. Article 218.i. for not timely,
fully advising Petitioner of the actual reason for bringing Petitioner
in for interrogation, August 5, 2012, when "all" the officers knew
from the beginning the actual reason. This violated Miranda going
up against the roots of the poisonous tree. [Miranda v Arizona, 384
U.S. 436 (1966)] Article 1 § 13 of the LA Constitution of 1974,
quotes that a defendant shall be fully advised from the start of in-
terrogation for the exact reason for his arrest or interrogation.

During Petitioner's tenure in jail while these changes remained,
he was transferred to Richwood Correctional Center May 5, 2013.
[Submitted], DIMINUTION OF SENTENCE AND THE STATEMENT OF GENE-
RAL CONDITIONS UNDER WHICH DIMINUTION OF SENTENCE / PAROLE SU-
PERVISION IS GRANTED forms that was given Petitioner from comple-
tion of program/release date, July 31, 2013. Petitioner had his
Mother's address written on the form. He was awaiting a bus at
the bus station to proceed to this address. The officials from
Richwood Correctional Center returned to the bus station explaining
to Petitioner that he had some more paper work to sign. They re-

turned to Richwood Correctional Center.

After arriving at the correctional center, Petitioner was hand-cuffed. The secretary scratched off the address telling him that he had a detainer in Washington Parish on him. This detainer was on the charges that Washington Parish Sheriff's Office tried to mask as the reason for arresting Petitioner August 5, 2012. The Sheriff's Office knew of the time Janet Branch and Petitioner had been dating, on and off for approximately eight (8) years. There have been minor incidents during the whole time these people have been to-gether. [Arrest reports, supra]

Therefore, through a thorough showing of facts, statements from in-cident reports and transcripts; and inactions of the Washington Parish Sheriff's Office that Petitioner's due process were violated through LA CCr.P. Article 218.1.; Article 1 § 2 of the LA Constitution of 1974, Amendment 14 of the United States Constitution with ineffective as-sistance of counsel not adhering to the improper way Lead In-vestigator Detective Stubbs did not properly advise Petitioner of the reason for being interrogated. This violated LA CCr.P. Article 511, Article 1 § 16 of the LA Constitution of 1974, and Amendments 5 and 6 of the United States Constitution.

(III.)      BRADY ISSUE VIOLATIONS

Petitioner asserts that failure of the prosecution in a criminal case to make a timely and proper disclosure to the defense of certain physical, technical, representational, or documentary evi-dence within its possession violates federal due process guarantees set forth in Brady v. Maryland, 373 U.S. 83 (1963). In this case the prosecution was often accused by Counsel Knight because this took

place in withholding exculpatory and supposedly inculpatory evidence that was just brought in by Janet Branch who is not an officer of the law. The erroneously used evidence was used at trial with Lead Investigator Detective Stubbs not having any idea of where it came from because a true crime scene was never set up by the Washington Parish Sheriff's Office at any time. [Transcripts, Page 43 - 49], [Page 43, line 10 - 21], Q. Did you take any photos of the alleged crime scene? A. No, sir. Like I said, I never went to the crime scene. Q. Do you know if anybody in the sheriff's office took any photos of the alleged crime scene? A. No, Sir. Q. So you never went to the crime scene? A. Correct. Q. And you were the lead investigator on the case? A. Right. Counsel Knight filed a MOTION TO EXCLUDE DNA EVIDENCE that was DENIED, April 14, 2014. [Motion Submitted] This motion was filed due to the improper time the prosecution disclosed it to the defense.

The Washington Parish Sheriff's Office and the District Attorney received this DNA testing November, 2012. [DNA file submitted] The analysis shown that the DNA evidence the prosecution had was evidence where Janet Branch had scratched Petitioner's face. This evidence was held back for an improper time deliberately for the purpose of deceiving and obtaining an undue advantage over the defense. Under Brady an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment including exculpatory evidence where the prosecution has a continuing duty to disclose timely to the defense. [LA C.Cr. P. Article 729.5; U.S. v Blais, 98 F.3d 647 (1996); Strickler v. Green, 527 U.S. 263 (1999); U.S. v Gil, 297 F.3d 93 (2002)]

Criminal discovery rules are intended to eliminate unwarranted prejudice, which arises from surprise evidence in order to permit the defense to respond to the state's case properly by allowing the defense timely to with accurately assess the strength of the state's case. [State v Williams, 866 So.2d 1003 (5TH Cir. 2004)] This Brady violation under LA C.Cr. P. Article 718 is shown by demonstrating that which was withheld by the state until just days before the trial. This did not give the defense the proper time allotment to allow the defense to obtain an expert witness who could reasonably be taken to put the whole case in such a different light as to undermine confidence in the outcome of the verdict. [LA State Police Crime Lab report]

Honorable Judge Garner asked Counsel Knight if a Bill of Particulars was filed in this case. He could not remember, but it was filed by Counsel John W. Houge, III, on February 6, 2013. [Motion submitted] There was an open file policy to the defense with the evidence of the prosecution's case. Why was this DNA analysis withheld until just days before trial? This DNA analysis was sufficient to the defense for exculpatory evidence that was in it. Counsel Knight is a legal representative not a medical examiner. The withholding of this scientific testing deprived Petitioner of a fair trial. [State v Valberte, 665 So.2d 614 (5TH Cir. 1995)]

The state's failure to disclose timely this material evidence favorable to the defense implicates more than Petitioner's discovery rights. The prosecutor has an affirmative duty to disclose such evidence under the 14TH Amendment's due process clause and failure to reveal this evidence in a timely manner implicates Petitioner's right to a fair trial establishing prejudice requiring dismissal of this conviction and sentence by this Honorable Federal Court. [State v Marshall, 660 So.2d 819 (1995); State v Ellis, 657 So.2d 341 (5TH Cir. 1995); ABA Stan-

18

dards, Defense Function, Standard 4 - 4.6 Physical evidence c.(4)☐

Petitioner desparately needed an expert witness at the state's expense to properly read and prepare the DNA analysis through his indigence for otherwise he was unable to appropriately prepare with accuracy knowing exactly what the Rape Kit stated. Petitioner was prejudiced by his inability to hire an expert witness. [State v Durosseau, 637 So.2d 1065 (1994)] The theory of Petitioner's innocence was never brought up during the proceedings by Counsel Knight. Why? Was this a shown presence of his disloyalty to Petitioner?

The Washington Parish Sheriff's Office and the prosecution failed to timely disclose this evidence that they had in their possession for one (1) year and five (5) months before trial. This evidence was suppressed from Brady purposes through: (1) the prosecution failing to timely disclose evidence that law enforcement or it was aware of and had before it was too late for the defense to make proper use of it, or (2) the evidence was not otherwise given to defense through the exercise of reasonable diligence. This conceivable adverse effect on the defense through Counsel Knight's deficient performance in all aspects of the defense in light of the suppression of the analysis kit is not harmless error. It could not create a conclusion beyond reasonable doubt. There is no valid tactical reason for not attacking the analysis kit from the way the prosecution made the delay in turning it over to the defense.

In the analysis Kit the semen tests were exculpatory evidence excluding Petitioner as depositor of the semen. The paper work of the LA State Police Crime Laboratory forms on Page 3 of 5, Exhibit 1K1, the DNA profile obtained from the swab taken from the right hand fingernail scrapings and scraper was consistent with being a mixture of DNA from two individuals, one major contributor and one minor contributor. Janet Branch (Exhibit 1A1) cannot be excluded as the major contributor of this profile. The minor

contributor was present at such a low concentration that a valid DNA profile could not be obtained.

DNA testing procedures produce reliable results. It establishes to a virtual certainty whether a given individual did or did not commit a particular crime. [Harvey v Horan, 285 F.3d 298 (2002)] The state's DNA tests will confirm Petitioner's guilt, yet Petitioner is innocent of these charges. This Honorable Federal Court should dismiss the invalid legal conclusions reached by the state court system.

In the analysis kit the reports were exculpatory evidence excluding Petitioner as the depositor of the semen. This is a very important factor in the state not turning over the tests along with Counsel Knight not filing for a continuance to have the analysis kit properly examined by an expert witness. Counsel Knight was not fulfilling his necessary and important function advocating within the adversary of the defense. [Mc Coy v Court of Appeals, 486 U.S. 429 (1988); U.S. v Wade, 388 U.S. 218 (1967); Standard 4 - 4.1 Duty to Investigate (a)]

Effective representation may avert the need for courtroom confrontation. There were pictures supposedly taken by Melissa Creel at the Washington Parish Rape Crisis Center. [Transcripts, page 180-202] There were also pictures taken by Detective Stubbs. Then there were pictures taken by Janice Magee in the Mc Donald's bathroom. These are the only photos submitted to Petitioner. What happened to the photographs that were taken By Melissa Creel or Detective Stubbs? This case depended only on Janet Branch's word with nothing conclusive in this case creating unfair prejudice from the beginning of this case to this day. This is extensive to violating due process of law according to Brady v Maryland, supra. Exculpatory evidence was present in the Analysis kit, which the prosecution violated LA CCr.P. Article 729.3 Continuing DUTY to disclose was violated as well as completely overlooked.

Again, Counsel Knight should have paid attention to Petitioner claiming his innocence during the start of the proceedings throughout them, yet he did not. Lead Investigator Detective Stubbs or other officials from the Washington Parish Seriff's Office "never established" a crime scene nor went out to Petitioner's trailor to get items that were supposedly involved in this serious supposedly alleged crime, nor the analysis Kit was never went over by an expert witness to certainly see what the analysis actually said with the law enforcement Keeping it just days before trial. All of these violations established great prejudice against the defense creating a huge lack of confidence in the verdict. The evidence of this case does not support the conviction showing all the elements of the crime were actually proved beyond a reasonable doubt. [Jackson v Virginia, 443 U.S. 307 (1979)]

The prosecutor must timely give the defense exculpatory evidence that renders a fair trial with a competent verdict, yet this did not take place justifiably. The inncorrect manner District Attorney Adair took the defense through these proceedings was prosecutorial misconduct. Prosecutors are supposed to seek justice not merely convictions. Proscartor Adair repeatedly violated his duty throughout these proceedings. Prosecutors — the nations most elite and powerful law enforcement themselves — violate laws and ethics, which was done throughout this case. This wrongful conviction is the most serious. This prosecutorial misconduct has placed an innocent person in prison.

Whereas, the issues presented in this claim have indicated a serious Brady violation, proseecutorial misconduct, and ineffective assistance of counsel. These violations have created indiscrepenticies with LA C.Cr.P. Articles 511, 718, 719, and 729.3; Article 1 § 2 and § 16 of the LA Constitution of 1974, and Amendment 5, 6, and 14 of the U.S. Constitution.

(IV.) COMPULSORY PROCESS AS STATED IN LA C.Cr.P. Articles 731 AND 738, Article 1 § 16 of the LA Constitution of 1974, AND The 6th Amendment to the U.S. Constitution

Adequate investigation is a requisite of effective assistance of counsel. [State v Francis, 809 So.2d 1132 (2002); Progress of the Lawyer's Work /Investigation and Preparation, Lawyer's notes, supra] Petitioner respectfully asserts that Counsel Knight failed to sufficiently conduct a pretrial investigation thereby abridging his fundamental right to effective representation, failure to advocate for his client, and prejudicing Petitioner's defense abanding his investigation of eye witnesses and witnesses against the defense. [ABA 5-1.6, 5-2.4, and Standard 4-4.1]

Effective investigation has an important bearing on competent presentation at trial for without adequate investigation counsel is not in a position to the best use of mechanisms as cross-examination, impeachment of adverse witnesses, or to know how or what witnesses would testify in Petitioner's behalf. If Counsel Knight would have investigated all witnesses including the alleged victim, there is a reasonable probability that the outcome of the proceedings would have been different. This is based on the facts that would have been presented surrounding the witnesses that were called including the ones that were subpoenaed, yet they were not involved in this case from the beginning or during trial. [Witnesses subpoenaed submitted]

The 6th Amendment was designed in part to make testimony of defendant's witnesses admissible in his behalf in court. Leroy Slick Seals was never interviewed by the Washington Parish Sheriff's Office, the prosecution, nor by Counsel Knight. Surely, right before trial he was in the hospital. There is no showing by an official that they checked up on his nature of health before trial, so he could substantiate Petitioner's innocence,

22

nor to see if he was healthy enough to testify at trial. The right of an accused to have compulsory process for obtaining witnesses in his favor stands on no lesser footing than other 6th Amendment rights holds to the states. Why was Mr. Seals "never investigated" by any official? All of them knew that this investigation would have thrown a completely different light upon this whole case. Leroy Slick Seals would have had Petitioner arrested at approximately 9:00 a.m, not twelve (12) hours later because the time, 3rd eye witness, he saw Janet Branch the police would have came to arrest Petitioner. Leroy Slick Seals was a police officer. In re Oliver, 333 U.S. 257 (1948), describes what the most basic ingredients of due process of law. It is observed that a person's right to a reasonable notice of a charge against him, an opportunity to be heard in his defense – a right to his day in court — are basic in the system of jurisprudence. These rights include as a minimum, a right to effective assistance of counsel, a right to examine the witnesses against him, to offer testimony, witnesses in his behalf. [McMann v Richardson, 397 U.S. 759 (1970)]

The right to offer testimony of witnesses in your behalf and to compel their attendance is in plain terms of the right to present a defense. This is the right to present the defendant's version of the facts as well as the prosecution's witnesses to the jury, so it may decide where the truth lies. This establishes a proper defense that was not created by Counsel Knight.

Tamara Mage Dunaway was called as a witness. Janet Branch had made some serious statements against Petitioner to her on three (3) occasions. [Transcripts, Page 84, lines 6-11], Q. Did she say anything unusual to you on that occasion? A. She said that she loved Woody. And that if she could not have him, that she wouldn't see him with anyone else. That she would see to it that he would be put away for a very, very long time. [lines 14-30] That took place, there's three different times she told me that. Q. Do you recall the other two occasions? A. Yes, I do. One time, I had

23

went to get her to bring her to town to make groceries. And the other time is when I lived in the apartments across the road from her. Q. Okay. She said if she wasn't going to be together with Woody, that she was going to make sure he went away for a long time? A. That's right. Q. She told you that on more than one occasion? A. She told me that three times. Q. Okay. Now, over the years, do you recall when they were these occasions were? A. The last time she told me that was not long after this happened, this last incident. [Transcripts, Page 85, lines 1-3], A. Yes. At my house. Q. Okay. Was that -- A. On the back porch. [Lines 9-19], Q. Now, Ms. Magee, do you have any firsthand know-ledge about whether or not Janet Branch was, had ever indicated that she was jealous of Woody Magee for his other girlfriends? A. Sure she was jealous. She loved him. Q. How did she, did she ever express any jealousy to you or behave in any certain way? A. Well, you know, she told me, you know, that she loved him. And if she couldn't have him, nobody else would. She would see that he would be gone away for a very long, long time. [Page 86, lines 5-19], Q. Woody and Dana Hosca? A. Uh-huh (affirmative response). Q. Do you know by your own personal knowledge how that affected Janet Branch? A. I know she was highly hurt by it. Q. Now, did you ever have a conversation with Janet Branch about it taking $5,000 to drop the charges against Woody? A. Right. Because I had asked her, you know, what about dropping the charges. And she said they told her that she would have to have $5,000 or do two years in jail if she dropped the charges. Q. She said that she had to pay $5,000 or do two years in jail if she dropped the charges. A. Correct. [Lines 27 - Page 87, lines 1-2], Q. Did you ask her to drop the charges against Woody Magee? A. No, sir, I did not. Q. Do you know if anyone asked her to drop the charges? A. It was most likely Mother, I would think. I don't know. Woody might have asked her to. I don't know. [Page 92, lines 25-30] Q. Ms. Magee, do you know as a result of your conversation with Janet Branch, about the.

$5,000, or two years, if she dropped the charges, where she got that information from? A. No, sir. I guess she got it from whomever her legal advisor was at this time, at that time.

On the Transcripts, Page 88-92, why did District Attorney Adair try to adhere Ms. Dunnaway's testimony so strongly. She was sworn to the whole truth. Why make false accusations about what was told to her by Janet Branch? Why did counsel Knight during the beginning of these proceeding bring out Janet Branch's credibility? Three (3) prominent people (eyewitnesses) were not interviewed by Counsel Knight. No attempt was ever made to investigate "any witness." Petitioner asserts that he was not afforded the right to counsel in any substantial sense. To decide otherwise, would simply be to ignore actualities. [Strickland v Washington, supra] There were constraints upon Counsel Knight from the law enforcement and prosecution having the analysis kit for a year and five (5) months, but in the context of the whole case lots of Counsel Knight's inactions were self-imposed. [Cuyler v Sullivan, 466 US. 335 (1980)] Counsel Knight might have been conscious of his duties towards Petitioner, yet he sought conscientiously to discharge those duties prejudicing the defense through lack of assistance during all stages of the proceedings. [Hamilton v. Alabama, 368 U.S. 52 (1961)]

Whereas, Petitioner asserts that through promptly showing within this claim due process of law, compulsory process, and affective assistance of counsel have been violated from the start of this case to this day. Violations of LA CCr.P. Article 731, Article 1 & 2 and 16 of the LA Constitution of 1974, and Amendments 5, 6, and 14 of the U.S. Constitution have occurred. Petitioner urges that through violations of these cannons, statutes, and constitutional amendments this Honorable Federal Court should dismiss this conviction and sentence that justice may be served in this instance.

# CONCLUSION

THEREFORE, Petitioner has well shown throughout the argument of this petition the extraordinary way that Janet Branch was seen at a close distance of three (3) prominent eyewitnesses that after three (3) days of being beaten in the face; the falsification she stated approximately six (6) hours later was not there the second day nor the third morning was present except for her crying. Petitioner has well presented through facts from statements, testimony from two (2) eyewitnesses, and from one (1) eyewitness that was never interviewed or interrogated by any law enforcement official. If Leroy Slick Seals had of been interrogated by any law enforcement official, this case would not have had the same verdict. In fact this case would have never went to trial. Petitioner has well shown and presented false statements made intentionately with reckless disregard for the truth was necessary for finding probable cause, where the truthfulness of Janet Branch's factual statements were not shown at the proper time. Petitioner has established by a perponderance of evidence that allegations of perjury through false statements where the remaining content is insufficient to establish probable cause. Petitioner is challenging the truthfulness of factual statements made in the affidavit that were false.

Leroy Slick Seals, third eyewitness, was a police officer when this supposedly alleged crime took place. He would have seen from the beginning if Janet Branch's face was bruised and swollen from being beaten in the head and else where for three (3) days. Petitioner would have been arrested around 9:00 a.m. not twelve (12) hours later by a vindictive, Lead Investigator Detective Stubbs. Romona Magee, second eyewitness, would have discussed the severe bruising on Janet Branch's face early in the morning with Leroy Slick Seals if it had been there. But it was not there at that time. Again, Petitioner would have been arrested at this time not twelve (12) hours later.

Lead Investigator Detective Stubbs nor the Washington Parish sheriffs Office never established a crime scene at Petitioner's trailor or

went out there to it. There was evidence of a knife and crutch that was never presented in the prosecution's file. Janet Branch brough clothes that were used during the trial. Janet Branch is not a police officer in Washington Parish. How can anyone except her know where the clothes came from? Lead Investigator Stubbs nor District Attorney Adair did not know where they came from. [Transcripts, Page 31, lines 21 - Pg. 32 lines 1-3], Q Do you know where she got it? A. She said she had recovered it. Q. No. Do you know where she got it? Do you know -- A. Was I there when she got it. No. Q. Were you there when she got it? A. No. Q. Was anyone from the sheriff's office there, to your knowledge, when she got it? A. Not to my knowledge. Q. So you don't know, from your own personal knowledge, where this shirt came from? A. No. I was not around when it was recovered. Q. You would only have to take the word of Janet Branch where the shirt came from. A. Correct. [Page 32, lines 14 - 20], Q. Turned in by the complaining witness in this case. Do you typically take evidence from complaining witnesses in the case? A. If they recover something we don't, yes. We will take it, yes, sir. Q. Even though you don't know where it came from? A. I don't know exactly where it came from. Counsel Knight acted as if it were surprise evidence when he had an open file policy to the prosecution's evidence, Randy Seals did not turn it over to the defense.

 The false statements and accusations by Janet Branch were knowingly, intentionally, and with reckless disregard for the truth that was included by the affiant in the warrant affidavit where it was necessary to the finding of probable cause. The Fourth Amendment, as incorporated in the Fourteenth Amendment requires examination in the misrepresentation in the warrant affidavit. The braising came upon Janet Branch's face during the six (6) hour period after she left Romona Magee's residence.

 Romona Magee stated in her testimony during trial observing pictures that Janet Branch's face looked nothing like the photographs she perceived. She stated, "Janet Branch had been crying." Darryl Cooper, first eyewitness, never stated in his statement or testimony that he saw any

bruises nor violence from Petitioner against Janet Branch in any form. Also, Janet Branch stated in her statement and testimony at trial that she yelled and hollered at Darryl Cooper to help her or call 911. He stated in his statement and testimony at trial that she did not say anything. Darryl Cooper had no reason to justify what Petitioner or Janet Branch said or done. How can three (3) prominent eyewitnesses not see or go along with what was implied by Janet Branch at the proper time when it was supposed to have happened for three (3) days?

Harmless error will not dispose of this controversy. Petitioner asserts that the warrant should have been tested for veracity and the evidence excluded. It is still clear that beyond a reasonable doubt that the evidence complained of did contribute to Petitioner's conviction. The erroneous statements made by Janet Branch in bad faith with the misrepresentations of facts she made to the police and prosecution in this case. The Honorable Court declined to use the exclusionary rule when illegally seized evidence was not used to impeach the credibility of Janet Branch's testimony. None of these actions are trivial. It deals both in regard to when illegally seized evidence is excluded and when investigation on allegations of misstatements must be accorded. An instance of deliberate falsity will be exposed and confirmed without a special inquiry at trial. Counsel Knight let the falsified locking up of Petitioner go through with no investigation of any type. Surely, it is an unpleasant task to strip a man of his freedom and subject him to institutional restraints when he is innocent of the falsified charges against him. Why was the responsibility to interview or investigate three (3) prominent eyewitnesses by Counsel Knight, the Washington Parish Sheriff's Office, or the prosecution completely overlooked?

Detective Stubbs was the Lead Investigator in this case. Petitioner urges this Honorable Federal Court to thoroughly examine how LA C.Cr.P. Article 218.1, was violated denying Petitioner his due process rights from the beginning of this case. Detective Stubbs and the patrol officers of the

28

Washington Parish Sheriff's Office "all" knew from the beginning of this case "exactly" what they wanted to investigate and question Petitioner on. Why did Lead Investigator Detective Stubbs and the patrol officers when they all knew the exact reason for Petitioner being questioned, go directly against the law? What was the purpose of Petitioner not being fully advised when the patrol officers picked him up or when Detective Stubbs started recording him? Why is there vindictiveness against Petitioner? This completely violates Miranda going up against the roots of the poisonous tree. LA C.Cr.P. Article 218.1. and Article 1 § 13 of the LA Constitution of 1974, where in both sections it states that a defendant shall be fully advised from the start of the investigation for the exact reason for interrogation or arrest.

Petitioner was transferred to Richwood Correctional Center. July 31, 2013, he has his Mother's address on the Diminution of Sentence form. Petitioner awaited a bus at the bus station when the officers of Richwood Correctional Center returned. They explained he needed to sign some paperwork. When he returned the secretary had him handcuffed, scratching off his Mother's address, and telling him that he had a DETAINER in Washington Parish. Again, he was "not fully advised" of the proper reason that he was returned to Richwood Correctional Center. Why was this detainer not picked up before he left Richwood Correctional Center? Surely, the secretary checked NCIC before Petitioner went to the bus station to go home. The Washington Parish Sheriff's Office believed this incident was a sham from the length of time Petitioner and Janet Branch dated.

Why did the prosecution and Washington Parish Sheriff's Office keep the DNA analysis for one (1) year and five (5) months? Suppression of this evidence violates federal due process set forth in Brady v. Maryland. This evidence was held back for an improper time for the purpose of deceiving and obtaining an unfair advantage over the defense by not allowing a timely disclosure of this evidence. This evidence was not timely disclosed to the defense violating LA C.Cr.P. Article 729.3. The prosecutor must timely

29

disclose exculpatory evidence to the defense timely that renders a fair trial, having a competent verdict that did not happen in this case. Why did Counsel Knight not argue during any witness against Petitioner while examining them how they or the prosecution failed to offer forensic evidence that would have found Petitioner guilty beyond a reasonable doubt. His strategy boiled down to a desire to avoid extra work. Counsel Knight made no challenge to anything or any way the prosecution came at the defense failing to advocate the prosecution's case in any way. Why did Counsel Knight not go against "all" testimony that Janet Branch made for nothing coincided to anything the other eyewitnesses said. Leroy Slick Seals cannot tell what facts he knew. He was never investigated by any law enforcement official or by Counsel Knight. Mr. Leroy Slick Seals passed on. He can no longer verify Petitioner's innocence. As stated, if Leroy Slick Seals would have been interrogated by any law enforcement official, this case would not be in the jurisdiction of this Honorable Federal Court.

In plain terms the right to present a defense after investigation and preperation is just as important to produce the truth in the version of the facts where the truth promptly lies. An investigation of nothing proper was done by Counsel Knight, the Washington Parish Sheriff's Office, or the prosecution. If investigation by Counsel Knight had of been done in the slightest way the case would have never went to trial. Where was Counsel Knight's duty of loyality at involving Petitioner's innocence? This case relied only on Janet Branch's testimony and few facts that were proven fabrication if not by Darryl Cooper's statement and testimony during trial, Ramona Magee's testimony during trial, and by "not interviewing or interrogating" the third eyewitness to seeing Janet Branch at a close distance at the time she left Ramona Magee's residence, Leroy Slick Seals. What did Petitioner really do to establish vindictiveness from the law enforcement officials towards his innocence of a crime that he did not commit?

THEREFORE, Petitioner has well shown through this petition the many violations of due process, the true lack of Washington Parish Seriff's Office violating Petitioner's due process rights not fully advising him when he was first brough in for questioning the true facts of the interrogation while "all offi-cials" knew from the beginning of the interview, prosecutorial misconduct that took place from the prosecution not timely disclosing the DNA analysis report until days before trial and throughout the proceedings, and Counsel Knight throwing Petitioner to the wolves not establishing a defense or ad-vocating the prosecution's case properly, or creating a defense. Counsel Knight's ineffective assistance of counsel prejudiced the defense where the trial was not fair not creating a competent verdict.

Wherefore, Petitioner urges that this Honorable Federal Court through the many constitutional violations that took place from the beginning of this case throughout it, dismiss the conviction and sentence to where the ends of justice may be served.

In advance, Petitioner thanks this Honorable Federal Court for its time, assistance, and consideration involved in this important matter.

Respectfully submitted:

Jimmy Woodrow Magee

JIMMY W. MaGEE 506556
DIXON CORRECTIONAL INSTITUTE
UNIT 2 DORM 1
P.O. Box 788
Jackson, LA 70748-0788

31

## CERTIFICATE OF SERVICE

I, JIMMY WOODROW MAGEE # 506356, placed an exact copy of the
PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A
PERSON IN STATE CUSTODY to WALTER P. REED, DISTRICT ATTORNEY,
22nd JUDIAL DISTRICT COURT, PARISH OF WASHINGTON, 905 PEARL
STREET FRANKLINTON, LA 70438, this _____ DAY OF MAY, 2019.


*Jimmy Woodrow Magee*
JIMMY WOODROW MAGEE